# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

CHRISTOPHER PLOSS,     )
                                 )
     Plaintiff,          )
                                 )
     vs.               )     **Case number 4:12cv1755 TCM**
                                 )
CAROLYN W. COLVIN, Acting   )
Commissioner of Social Security,  )
                               )
     Defendant.        )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Christopher Ploss (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for DIB and SSI in October 2008, alleging he was disabled as of January 31, 2004, because of psychosis, bipolar disorder, psychotic disorder, auditory and visual hallucinations, shaking hands (a medication side effect), and hypoglycemia. (R.[1] at 131-40, 196.) He stated he was not alleging he was disabled prior to the age of twenty-two

---

[1]References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

years.  (<u>Id.</u> at 131.)  His applications were denied initially and after a hearing held in April 2010  before Administrative Law Judge (ALJ) Michael Mance.  (<u>Id.</u> at 7-18, 30-65, 59, 62-6753.)  The Appeals Council denied Plaintiff's request for review, thereby effectively adopting the ALJ's decision as the final decision of the Commissioner.  (<u>Id.</u> at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Brenda G. Young, M.A., testified at the administrative hearing.  At the beginning of the hearing, Plaintiff amended his alleged disability onset date to August 26, 2008.

Plaintiff testified that he was then 30 years old and lives with his sister, her husband, and their three children.  (<u>Id.</u> at 34.)  Eighth grade is the highest grade he completed.  (<u>Id.</u>)  Plaintiff dropped out of school in the ninth grade.  (<u>Id.</u> at 35.)  He has not tried to get a General Equivalency Degree ("GED") because he cannot concentrate.  (<u>Id.</u> at 49.)

Plaintiff last worked in 2004.  (<u>Id.</u> at 34.)  Asked about a record showing he made $2,636 in 2008, Plaintiff replied he was "not aware of that."  (<u>Id.</u>)  Asked about Modern Maintenance, Plaintiff replied that he did work for that company for awhile.  (<u>Id.</u>)  Asked why he cannot work, Plaintiff explained it is because of his medications:  Valium, Ultram, trazodone, and Paxil.  (<u>Id.</u> at 35.)  He cannot remember when he started taking them.  (<u>Id.</u>)  The medications do not help, and he has told his psychiatrist this.  (<u>Id.</u> at 38-39.)  Plaintiff first testified they have no side effects, but later explained that they make him sleepy and groggy.  (<u>Id.</u> at 39.)  He wakes up every morning with no energy, and has been doing so

"[f]orever." (<u>Id.</u> at 39-40.) He takes Ultram for shooting pains in his back. (<u>Id.</u> at 36.) The pains are caused by "lifting tar buckets over the years." (<u>Id.</u>)

Plaintiff testified he spends his days keeping to himself and sitting on a couch. (<u>Id.</u> at 36, 42.) Occasionally, he helps his sister by picking up. (<u>Id.</u> at 36.) He does not cook or do his own laundry or shopping. (<u>Id.</u> at 37.) He drives "[v]ery, very occasionally." (<u>Id.</u>) He drove to the hearing; once a month, he drives to his parents' house. (<u>Id.</u> at 45.) He does not have any difficulty driving. (<u>Id.</u>)

Asked if he was still smoking marijuana, Plaintiff replied, "No." (<u>Id.</u> at 37.) Asked when was the last time he did, he replied that it had "been a while." (<u>Id.</u>) On further questioning, he clarified it had been less than twenty-four hours. (<u>Id.</u>) Asked how often he smoked, he first responded that it was every other day and then responded it was once a day. (<u>Id.</u>) He smokes marijuana because it calms him down. (<u>Id.</u> at 37, 50.) He considers marijuana to be "a medically proven drug," not a hallucinogenic drug. (<u>Id.</u> at 50.) He smokes half a pack of cigarettes a day. (<u>Id.</u> at 37.) He gets his cigarettes from family and his marijuana from family and friends. (<u>Id.</u> at 37-38.) He sees a friend approximately every six months. (<u>Id.</u> at 46.) Approximately once a month, he goes to church. (<u>Id.</u>)

Plaintiff testified he cannot stand for longer than fifteen minutes before he has to hold onto something. (<u>Id.</u> at 38.) He has no problems sitting. (<u>Id.</u>) He can lift fifty to one hundred pounds. (<u>Id.</u>) Occasionally, he paints birdcages. (<u>Id.</u>) Plaintiff ges along with close friends. (<u>Id.</u> at 39.) He has problems being in crowds and is "[v]ery paranoid." (<u>Id.</u> at 39, 43.) Plaintiff hears voices telling him to do "crazy things." (<u>Id.</u> at 40.) He also sees moving

shadows. (Id. at 41.) The shadows scare him. (Id.) Plaintiff has problems sleeping. (Id. at 43.) He wakes up in the middle of the night and, because of his paranoia, looks out the window. (Id. at 44.)

Plaintiff stopped working because he cannot interact with people. (Id. at 44.) He has random outbursts, causing him to verbally abuse others. (Id. at 44-45.) He does not have the energy to make it through the day. (Id. at 45.) His medications prevent him from thinking clearly. (Id.)

When fishing, Plaintiff was assaulted by several people wielding a crow bar.[2] (Id. at 47.) Since then, it is very hard for him to go anywhere unless he is armed with a weapon. (Id.)

His sister reminds him to shower and do such other personal hygiene tasks as brush his teeth. (Id. at 48.) She also reminds him to take his medications. (Id.)

Ms. Young, testifying as a vocational expert, classified Plaintiff's past work in driveway sealing as heavy and unskilled and as a grocery bagger as medium and unskilled. (Id. at 51.) She was then asked by the ALJ to assume a hypothetical claimant of Plaintiff's age, education, and past work experience who has no exertional limitations. (Id.) This claimant should avoid concentrated exposure to unprotected heights and hazardous machinery. (Id.) He "is limited to simple tasks which requires [sic] no more than occasional contact with the public and coworkers." (Id.) Ms. Young testified that this claimant can perform Plaintiff's past work in driveway sealing. (Id. at 52.) If this claimant can have "no

---

[2]In his next answer, Plaintiff identified the weapon as a baseball bat.

contact with the public as part of the job and no more than occasional contact with coworkers," the driveway sealing job is still appropriate. (Id.) If the claimant cannot perform a high production rate job and cannot perform any job requiring extensive reading, he cannot do the driveway sealing job because of the production requirement. (Id.) There are, however, other jobs this claimant can perform, e.g., janitorial jobs and a portion of hand packer and packager jobs. (Id. at 52-53.)

If the hypothetical claimant needs a job that allows occasional, unscheduled disruptions in the work day and work week because of potential periods of decompensation and an inability to concentrate, there are no jobs the claimant can perform. (Id. at 53.)

Asked by Plaintiff's counsel if the jobs she described would be appropriate if the claimant had the mental residual functional capacity described by Dr. DeVore, see pages 19 to 20, infra, Ms. Young replied that they would be. (Id. at 54.) Nor will any of the jobs be eliminated if the claimant has (1) a reading comprehension grade level of 2.9, a mathematical reasoning grade level of 4.0, and a numerical operation grade level of 4.5, or (2) an eighth grade education and no GED. (Id.) If the claimant has a Global Assessment of Functioning

("GAF") of 35 to 45,[3] he is not employable.  (Id. at 54-55.)  A claimant with a GAF of 55[4]

is "marginally employable" and can possibly perform Plaintiff's past work doing driveway

sealing and the other cited jobs if they are at entry level.  (Id. at 55-56.)

Ms. Young stated that her testimony was consistent with the *Dictionary of

Occupational Titles* and its companion publications.  (Id. at 53.)

### Medical, School, and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of

the application process, documents generated pursuant to his applications, school records,

records from health care providers, and assessments of his mental functional capacities.

When applying for DIB and SSI, Plaintiff completed a Disability Report, listing his

height as 6 feet 3 inches and his weight as 200 pounds.  (Id. at 195.)  His impairments, see

page one, supra, limit his ability to work by preventing him from remembering instructions

and concentrating.  (Id. at 196.)  His medications cause him constant fatigue.  (Id.)  His

---

[3]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  DSM-IV-TR at 34 (emphasis omitted).  A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.

[4]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at 34 (emphasis omitted).

illnesses first interfered with his ability to work in October 2001 and caused him to be unable to work on January 31, 2004.  (Id.)  He stopped working on November 1, 2004.[5]  (Id.)  Plaintiff worked sealing driveways between March 2004 and November 2004.  (Id. at 197.)  The highest grade he completed is the ninth grade.  (Id. at 201.)  This was in January 2006.[6]  (Id.)  He was in special education classes.  (Id.)

On a Work History Report, Plaintiff described the driveway sealing job as requiring that he walk for a total of eight hours each day, sit for two, reach for eight, and handle big objects for eight.  (Id. at 205.)  The heaviest object he occasionally lifted was one hundred or more pounds.  (Id.)  The heaviest object he frequently lifted was fifty or more pounds.  (Id.)  An earnings record for Plaintiff lists reportable wages in 1996 to 2003, inclusive, and 2008.  (Id. at 152.)  Of forty-four quarters, Plaintiff had reportable earnings in twenty-six.  (Id.)  In 2004, he earned $108[7]; in 2008, he earned $2,636.  (Id.)  His greatest earnings were $11,903, in 2002.  (Id.)

Plaintiff also completed a Function Report.  (Id. at 174-81.)  Asked to describe what he does from when he awakes until he goes to bed at night, he reported he eats, takes his medications, takes a nap, eats lunch, tries to work around the house, gets the mail, watches television, uses the computer, takes his medications, eats dinner, and goes to bed.  (Id. at 174.)  With his sister's help, he feeds the cat and cleans the fish tank.  (Id. at 175.)  He takes

---

[5]The apparent inconsistency between the two dates is not explained.

[6]Plaintiff would have been twenty-five years old in January 2006.

[7]All amounts are rounded off to the nearest dollar.

medication to help him sleep.  (Id.)  Before his illnesses, he could cook on the stove, drive a car, walk any distance, and handle stress.  (Id.)  He takes out the trash, unloads the dishwasher, and folds laundry.  (Id. at 176.)  He can no longer enjoy his former hobby of fishing because he will fall asleep and he cannot bait the hook because of his shaking hands.  (Id. at 178.)  His impairments adversely affect his abilities to lift, stand, walk, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, and use his hands.  (Id. at 179.)  They do not affect his abilities to sit and to get along with others.  (Id.)  He cannot walk farther than one hundred feet without having to stop and rest for ten to fifteen minutes.  (Id.)  He does not finish what he starts.  (Id.)  He does not follow written or spoken instructions well.  (Id.)  How well he gets along with authority figures depends on his mood.  (Id. at 180.)  He does not handle stress or changes in routine well.  (Id.)

Plaintiff's sister completed a Function Report Adult – Third Party on his behalf.  (Id. at 186-94.)  Her answers generally mirror his.  She additionally reported he goes to church every Sunday with their mother.  (Id. at 190.)  He visits with two high school friends over the telephone or in person.  (Id.) When asked what he was able to do before his impairments that he can no longer do, she responded that he has had problems most of his life taking care of himself.  (Id. at 209.)

On a Disability Report – Appeal form completed after the initial denial of his applications, Plaintiff reported that he now has severe anxiety and wears corrective lenses because of his hypoglycemia.  (Id. at 216.)  His auditory and visual hallucinations are worse.  (Id. at 220.)

School records from two districts were before the ALJ.  The first group is from Lincoln County R-II Schools.  (Id. at 340-51.)  Plaintiff attended schools in the district from first grade to the first semester of seventh grade.  (Id. at 340-41.)  On the Wechsler Intelligence Scale for Children – Revised ("WISC-R") administered in November 1990, he had a verbal score of 84, a performance score of 93, and full scale score of 87.  (Id. at 346.)  These scores placed him in the low average range of intelligence.  (Id. at 252.)  His speech skills were age appropriate; his voice quality and fluency were within normal limits.  (Id.)  His performance on standardized language tests indicated a diagnosis of learning disabled and language disordered in the areas of semantics and pragmatics.  (Id. at 347.)

A progress review meeting was held in September 1991 to discuss Plaintiff's math skills.  (Id. at 352-54.)  Testing revealed he had a learning disability in reading skills and comprehension, written language, and math calculations and applications.  (Id. at 353.)  His behavior was of concern.  (Id.)  He had difficulties with changes in routine and needed a structured environment.  (Id.)  There was "[a] severe discrepancy between achievement and ability."  (Id.)

In October 1994, it was noted that he could read "fairly well," but had trouble understanding what he read.  (Id. at 355-61.)  His language skills were "extremely weak"; his math skills were weak.  (Id. at 356.)  His attitude was poor.  (Id.)

Plaintiff enrolled in the Hazelwood schools after leaving Lincoln County.  An individualized education plan ("IEP") was developed for him in November 1994, identifying him as learning disabled and language impaired.  (Id. at 235.)  He was to receive 600 minutes

per week in special education.  (<u>Id.</u>)  On a list of task-related behaviors, Plaintiff was described as hourly needing directions or lessons repeated; requiring one-to-one instruction; and socializing at inappropriate times.  (<u>Id.</u> at 244.)  He daily demonstrated difficulty or reluctance in beginning tasks; difficulties staying with task and completing class assignments and homework; daydreaming or staring away from tasks; and difficulty working in a group setting.  (<u>Id.</u>)  On a list of interpersonal behaviors, Plaintiff was described as daily talking back; gesturing inappropriately to students; preferring one-to-one relationships rather than involvement with a group; teasing other students; and responding inappropriately to corrections and to comments from others.  (<u>Id.</u> at 245.)  Plaintiff "demonstrate[d] wide mood swings, significant impulsivity, poor peer interactions, significant difficulty complying to school and classroom rules."  (<u>Id.</u> at 252.)  A mental health evaluation was recommended.  (<u>Id.</u> at 254.)

In January 1996, it was noted that behavior resulting in a suspension was related to his disability.  (<u>Id.</u> at 234.)

The relevant medical records before the ALJ are summarized below in chronological order and begin in August 2008 when Plaintiff was taken by his mother to the St. Joseph Health Center emergency room and was "reportedly . . . confused, angry, frustrated, hearing voices for a few days, and talking about wanting to die."  (<u>Id.</u> at 258-72.)  He reported his boss was mean to him and wanted to kill him.  (<u>Id.</u> at 259.)  Plaintiff recently quit his job.  (<u>Id.</u>)  He stated he was bipolar, but could not "describe a typical manic episode."  (<u>Id.</u>)  He also was reported to be paranoid.  (<u>Id.</u>)  Daily, he smoked marijuana and three packs of

cigarettes.  (Id.)  He was not compliant with his medications.  (Id.)  He lived with his mother.  (Id.)  He quit school in the ninth grade because his family moved too much.  (Id.)  On examination, he was "somehow puzzled" and had poor eye contact and concentration, fluent speech, a fair mood and memory, and a distressed and anxious affect.  (Id.)  His flow of thought was "loose with aggressive thoughts toward his boss."  (Id.)  His insight and judgment were impaired.  (Id.)  He had no hallucinations.  (Id.)  His diagnosis was psychotic disorder, not otherwise specified.  (Id.)  His GAF was 35.  (Id.)  He was admitted and started on Haldol (an antipsychotic medication) and Cogentin (used to treat such symptoms as tremors).  (Id.)  A consulting physician, Huilin Li, M.D., noted that Plaintiff had chronic back pain due to heavy lifting at work and a history of hypoglycemia with no current symptoms.  (Id. at 262.)  Plaintiff's urine tested positive for benzodiazepines, oxycodone, and opiates, but not for cannabinoids.  (Id. at 271.)[8]

The next month, on September 4, Plaintiff went to St. Joseph Health Center in Wentzville complaining of being weak and tired since starting Haldol, the dosage of which had been increased by Dr. Wang, the psychiatrist who had treated him when hospitalized the month before, to twice a day.  (Id. at 301-10.)  Also, he was more forgetful and emotionally labile.  (Id. at 304.)  Plaintiff was told to take all four Haldol doses at night and take his other medications as directed.  (Id. at 302, 307, 308.)

Plaintiff returned two days later for complaints of pain in his right rib cage for the past two months.  (Id. at 293-300.)  His current medications included Haldol, Cogentin, and

---

[8]The hospital records do not include any relating to Plaintiff's discharge.

Celexa (an antidepressant).  (Id. at 298.)  Plaintiff was treated with Toradol (a nonsteroidal anti-inflammatory drug) and discharged.  (Id. at 299, 300.)  He was to follow-up with his primary care physician in five to seven days as needed.  (Id. at 300.)

Plaintiff was seen again at the St. Joseph Health Center Wentzville emergency room on September 9 for complaints of being unable to sleep, hallucinating, and anxiety.  (Id. at 279-92.)  He had quit his job a month earlier.  (Id. at 284.)  He stated he needed a change in medications.  (Id.)  He reported having hallucinations of hearing his nephew crying when the nephew was not there.  (Id. at 287.)  On examination, he was cooperative and pleasant.  (Id.)  His affect was within normal parameters.  (Id.)  It was noted he had an appointment with a psychiatrist in eight days.  (Id. at 286.)  Plaintiff was given a sleep aid, told to continue with his current medications, and discharged.  (Id. at 280, 283.)

Plaintiff returned on September 25, reporting he had a headache and was angry with his psychiatrist, who had told him to double his dosage of Haldol.  (Id. at 311-29.)  His hallucinations had resolved.  (Id. at 314.)  He had no "specific stressors."  (Id.)  He did not want to be admitted.  (Id. at 316.)  He only wanted his medications adjusted.  (Id.)  Plaintiff was given prescriptions for haloperidol (the generic form of Haldol), citalopram (the generic form of Celexa), trazodone, and benztropine (the generic form of Cogentin), and was discharged.  (Id. at 317, 318.)

On October 6, Plaintiff saw a psychiatrist, Lori Gavareni,[9] M.D., at Crider Health Center (Crider), reporting symptoms of shakiness, chest pain, shortness of breath, and anxiety attacks two to three times a week.  (Id. at 336, 338, 422-23.)  He was doing better on medications, but was groggier.  (Id. at 336.)  He hallucinated when stressed and his anxiety was worse.  (Id.)  He had applied for SSI.  (Id.)  On examination, he appeared groggy and tired.  (Id. at 338.)  His mood was okay; his affect was blunt; his insight and judgment were fair.  (Id.)  His prescriptions were renewed.  (Id.)

On October 29, Plaintiff saw a Richard Buckles, D.O., at Crider to establish general medical care and for a refill of his medications for schizophrenia.  (Id. at 322-23, 411-12.)  He reportedly was doing well on his medications, which included citalopram, tramadol (a pain reliever and generic form of Ultram), benztropine, haloperidol, trazodone, Abilify (an antipsychotic medication), and Valium.  (Id. at 323.)  His diagnoses included schizophrenia, hypoglycemia, and back pain.  (Id.)  His neurological examination was within normal limits.  (Id. at 322.)  He was given refills of his medications and told to follow-up with the psychiatrist.  (Id.)

The next day, Plaintiff saw Lawrence Ernst, O.D., for complaints of blurred vision.  (Id. at 325-33.)  A review of his symptoms was negative for psychiatric symptoms.  (Id. at 326.)  It was also noted that he did not smoke.  (Id. at 327.)  He drove and occasionally used

---

[9]The name of the psychiatrist is not listed in the medical records.  Plaintiff identifies her, without contradiction by the Commissioner, as Dr. Gavareni.  And, he lists her as his psychiatrist through his last, November 2009 visit.

the computer.  (Id.)  He was prescribed glasses for his astigmatism and was to return in two years.  (Id. at 332, 333.)

On October 31, Plaintiff informed Dr. Gavareni that he felt groggier on the Haldol, but was tolerating the Abilify well.  (Id. at 337, 424.)  He shook a lot and had trouble performing his daily routines.  (Id.)  He tired after walking a few miles.  (Id.)  He hallucinated when stressed.  (Id.)  On examination, he was fairly groomed and had a normal rate and rhythm to his speech.  (Id.)  His mood was okay; his affect was tired; his insight and judgment were fair.  (Id.)  He was diagnosed with psychosis, not otherwise specified, and general anxiety disorder ("GAD").  (Id.)  His GAF was 55.  (Id.)  His prescriptions for Celexa, Cogentin, and trazodone were continued.  (Id.)  His dosage of Haldol was decreased; his dosage of Abilify was increased.  (Id.)  He was to call in one week to update the psychiatrist on his condition and was to return in six to eight weeks.  (Id.)

Plaintiff saw Dr. Buckles in November after falling and hurting his back.  (Id. at 410.)  Plaintiff was going out of town over the holiday and wanted a refill of his medications early.  (Id.)

On January 2, 2009, Plaintiff informed Dr. Gavareni that he was not doing well; he was more agitated and paranoid.  (Id. at 423.)  His sister had noticed he was shaking more.  (Id.)  On examination, his grooming was fair; his speech was normal in rate and rhythm; his insight and judgment were fair.  (Id.)  The diagnosis was psychosis, not otherwise specified, and GAD.  (Id.)  He was to continue taking Celexa and trazadone.  (Id.)  His dosage of

Abilify was increased; Cogentin was stopped.  (Id.)  He was to start taking propranolol (used to treat tremors, among other things).  (Id.)

On January 22, Dr. Buckles declined to authorize a refill of tramadol for Plaintiff, informing him he needed to make an appointment.  (Id. at 410.)

Consequently, Plaintiff saw Dr. Buckles four days later for a refill of his medications, reporting that he had developed a tremor after a psychiatrist had adjusted his medications.  (Id. at 409, 413.)  He was to tell his psychiatrist about the tremor, which was detectable on examination.  (Id. at 409.)  He was building bird houses in his garage for extra money.  (Id.)  He had the  "[u]sual arthritic type pain," but no chest pain or shortness of breath.  (Id.)  The diagnoses were new onset tremor, bipolar by history, schizophrenia by history, and chronic pain.  (Id.)  His medications included Valium, citalopram, tramadol, benztropine, trazodone, and Abilify.  (Id.)

Plaintiff informed Dr. Gavareni on February 2 that he was doing well and tolerating his medications well.  (Id. at 426.)  The propranolol was helping with his hand shaking.  (Id.)  He was neither paranoid nor agitated.  (Id.)  His mood was good; his affect was euthymic.  (Id.)  He was continued on his current medications and was to return in two months.  (Id.)

The next month, however, he saw Dr. Buckles for refills, explaining he was out of his medications and, as a result, was in pain and had severe anxiety.  (Id. at 408.)  It was noted that Plaintiff did well on medications – he "can function and make birdhouses for sale."  (Id.)  He was to return in two months.  (Id.)

Plaintiff saw Dr. Gavareni later in March, reporting that Celexa was not helping and he was depressed. (Id. at 427.) He also felt the Abilify was not working. (Id.) He was hearing a buzzing sound, but not voices. (Id.) His mood was "not good"; his affect was anxious. (Id.) His Abilify and propranolol prescriptions were renewed. (Id.) Celexa was stopped; Paxil was added. (Id.)

He told Dr. Buckles on May 1 that he was much better; his anxiety was controlled by the Valium. (Id. at 407.) Plaintiff appeared pleasant and was less troubled. (Id.) His prescriptions included Ultram, citalopram, and trazodone. (Id.)

Plaintiff returned to Dr. Gavareni on June 8, reporting that he was hearing voices, but they were not clear and were not giving him commands. (Id. at 428.) He thought people were out to get him. (Id.) His mood was obsessive compulsive; his affect was anxious; his insight and judgment were fair. (Id.) His diagnoses were unchanged. (Id.) His dosage of Abilify was increased; propranolol was stopped. (Id.)

Plaintiff saw Dr. Buckles on July 1. (Id. at 406.) He was doing well mentally and physically. (Id.)

The next day, Plaintiff's mother telephoned Crider, reporting he had been beaten up the night before by approximately twenty guys wielding a crowbar. (Id. at 405.) He had gone to the emergency room and was given Vicodin, which did not help much. (Id.) A computed tomography ("CT") scan of his spine, head, face, and neck were negative. (Id.) The emergency room physician informed Plaintiff he would need rest and healing, but should return if he got worse. (Id.)

- 16 -

Plaintiff saw Dr. Gavareni on August 3. (<u>Id.</u> at 429.) He had been hearing voices but believed he could ignore them. (<u>Id.</u> at 429.) His mood was okay; his affect was anxious. (<u>Id.</u>) It was noted he had not been taking the trazodone; the medication was stopped. (<u>Id.</u>) His other medications were continued. (<u>Id.</u>) He was to return in two to three months. (<u>Id.</u>)

Plaintiff saw Dr. Buckles on August 31, reporting that the earlier assault had caused an increase in his anxiety. (<u>Id.</u> at 404.) Refills were given for his psychiatric medications. (<u>Id.</u>)

Plaintiff returned on October 30, explaining that his psychiatrist had moved out of the area, so he wanted Dr. Buckles to refill his prescriptions for Valium, Ultram, citalopram, trazodone, Adderall, Paxil, and Ability. (<u>Id.</u> at 403.) The physician informed Plaintiff that he needed to see a psychiatrist because he did not prescribe some of the medications. (<u>Id.</u>) Plaintiff was to return in three days for his non-psychiatric illness and problems. (<u>Id.</u>)

Plaintiff saw Dr. Gavareni on November 9, reporting that he was doing better and his mood was stable. (<u>Id.</u> at 430.) He had dreams twice a month, but they were not bad. (<u>Id.</u>) He was to return in two months. (<u>Id.</u>)

Later that month, he told Dr. Buckles he had "finally gotten an appointment with a psychiatrist but it [was] not until a few weeks." (<u>Id.</u> at 402.) Medication refills were given. (<u>Id.</u>)

On December 30, Plaintiff reported to Dr. Buckles that he was continuing to do well, but needed refills of his medications. (<u>Id.</u> at 401.) He had an appointment with a psychiatrist

at the end of the month.  (<u>Id.</u>)  He reported he could not function on the Adderall.  (<u>Id.</u>)  Refills were given.  (<u>Id.</u>)

Plaintiff next saw Dr. Buckles in February 2010.  (<u>Id.</u> at 400.)  He was trying to get on disability and was having difficulties getting a new psychiatrist.  (<u>Id.</u> at 400.)  He needed refills of his medications.  (<u>Id.</u>)

Also before the ALJ were assessments of Plaintiff's mental residual functional capacity.

On September 17, 2008, Plaintiff underwent an evaluation by David Peaco, Ph.D., a clinical psychologist.  (<u>Id.</u> at 275-78.)  Plaintiff reported he had worked for seven years sealing asphalt.  (<u>Id.</u> at 275.)  Although he loved the work, he had had to quit because his medications prevented him from being outside in the hot sun.  (<u>Id.</u>)  He began receiving mental health treatment in 2001 and had first been hospitalized one month earlier.  (<u>Id.</u>)  He had no history of drug or alcohol abuse.  (<u>Id.</u>)  The main source of stress in his life was having to quit a job he loved and being unable to support himself.  (<u>Id.</u>)  His general appearance and his motor activity were normal.  (<u>Id.</u> at 276.)  He "looked to be very fit."  (<u>Id.</u>)  He talked a lot and was cooperative.  (<u>Id.</u>)  His affect was a little labile; his mood was a little depressed.  (<u>Id.</u>)  His flow of thought "was extremely circumstantial."  (<u>Id.</u>)  His orientation was intact.  (<u>Id.</u>)  He had no serious memory problems and was able to recall all three words he was asked to remember for ten minutes.  (<u>Id.</u>)  He could repeat six digits forward and four backwards.  (<u>Id.</u>)  His fund of general information, vocabulary skills, intellectual functioning, and "ability to respond to social comprehension questions" were all well below average.  (<u>Id.</u>)

He indicated frequent feelings of sadness and irritability.  (Id.)  He "ha[d] little enthusiasm for activities and ha[d] low self-esteem."  (Id.)  He had no history of manic episodes, but thought he might have had one the month before when he thought his boss was going to try to kill him.  (Id.)  His persistence in tasks was "mildly impaired"; his pace and concentration were adequate.  (Id.)  He played with his nieces and nephews and took care of himself; he had no other activities.  (Id.)  He had no social life.  (Id.)  He had a valid driver's license, but no working vehicle.  (Id.)

Dr. Peaco's impression was of bipolar disorder, most recent episode with psychotic symptoms, and suspected borderline intellectual functioning.  (Id.)  His GAF was 45.  (Id. at 277.)  Dr. Peaco opined that Plaintiff could understand and remember simple instructions. (Id.)  "His social functioning was impaired due to a recent manic episode with psychotic symptoms.  His capacity to cope with the world around him is moderately impaired because of bipolar illness and low level of intellectual functioning."  (Id.)

In December 2008, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Kyle DeVore, Ph.D.  (Id. at 363-74.)  Plaintiff was assessed as having an organic mental disorder, i.e., a learning disability; a psychotic disorder, i.e., psychosis, not otherwise specified; an affective disorder, i.e., bipolar disorder; and an anxiety disorder.  (Id. at 363, 364-67.)  These disorders resulted in mild restrictions in his daily living activities, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  (Id. at 371.)  There were no repeated episodes of decompensation of extended duration.  (Id.)

On a Mental Residual Functional Capacity Assessment form, Dr. DeVore assessed Plaintiff as being moderately limited in one of the three abilities in the area of understanding and memory, i.e., understanding and remembering detailed instructions, and not significantly limited in the other two. (Id. at 375.) In the area of sustained concentration and persistence, Plaintiff was not significantly limited in four of the eight listed abilities and was moderately limited in four, i.e., (i) carrying out detailed instructions, (ii) maintaining attention and concentration for extended periods, (iii) working in coordination with or proximity to others without being distracted by them, and (iv) completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. (Id. at 375-76.) In the area of social interaction, Plaintiff was moderately limited in all but three of the five abilities and was not significantly limited in two. (Id. at 376.) In the area of adaptation, he was moderately limited in two of the four abilities and not significantly limited in the other two. (Id.)

In March 2010, Plaintiff was evaluated by Walter Clayton Davis, M.A., L.P.C. (Licensed Professional Counselor). (Id. at 414-18.) Plaintiff reported that he had "issues with Schizophrenia and BiPolar [sic] Depression," for which he took Abilify three times day, Paxil three times a day, and trazodone once at night. (Id. at 414.) These were prescribed by the psychiatrist he had been seeing once a month for the past two years. (Id. at 414, 415.) Mr. Davis noted that Plaintiff "appeared to be confused at times and required questions explained periodically that increased in frequency toward the end of the session. [Plaintiff]

also appeared to have difficulty with noting time frames of his past history." (Id. at 414.) Plaintiff reported he had had two previous hospitalizations for delusions and paranoia, but could not remember exactly when. (Id.) He had dropped out of school in the tenth grade, and had been in learning disabled and behavior disorder classes. (Id.) He had worked with asphalt, but stopped in 2007 because the heat would cause him to have a psychotic break and become verbally aggressive and paranoid. (Id.) He did not have a history of alcohol or drug abuse. (Id.) Plaintiff further reported that he had first had difficulties with his "Schizophrenia and Bipolar Depression" when he was approximately twenty years old. (Id. at 415.) This is also when he started hearing voices making paranoid statements. (Id.) He was admitted then to the hospital after an episode where he thought he was god. (Id.) The second hospitalization was one or two years earlier. (Id.) He did not now, or previously, have thoughts of harming himself or others. (Id.) He reported "he is easily agitated when around others when his thinking is paranoid, that results in him becoming verbally abusive." (Id.) He could not describe how often he had delusions and paranoia. (Id.) He reported "he could be 'good' for a month or two, then regularly have problems." (Id.) He could not define "regularly." (Id.) He had difficulty with anxiety which, when around other people, resulted in panic attacks. (Id.) Mr. Davis listed the mental symptoms Plaintiff reported as follows:

> Long term memory problems (difficulty remembering parts of his past)
> Reports of Auditory Hallucinations
> Restless Sleep
> Isolates to self regularly staying home
> Difficulty staying focused
> Periods of verbal outburst
> Poor social interaction
> Panic Attacks when around people

       Paranoid Thoughts of people "messing with him"
       Delusional Thoughts (believes he is "God" at times)[.]

(Id.)  Based on these reported symptoms, Mr. Davis diagnosed Plaintiff with schizophrenia with psychotic features and bipolar depression.  (Id.)  He assessed Plaintiff's GAF as 40.  (Id.)

Completing the same Mental Residual Functional Capacity Assessment form completed by Dr. DeVore two years earlier, Mr. Davis rated Plaintiff as markedly limited in all twenty abilities.  (Id. at 416-17.)

The following month, Mr. Davis was asked to consider Plaintiff's mental residual functional capacity if he assumed that Plaintiff had stopped smoking marijuana on a daily basis.  (Id. at 431-34.)  Mr. Davis noted that his previous assessment was based on Plaintiff having denied any use of marijuana.  (Id. at 431.)  If Plaintiff stopped, he would continue to have problems with delusions, hallucinations, and periodic verbal outbursts.  (Id.)  These problems "would continue to impact his ability to appropriately interact with others, work within proximity to others, complete a normal workday without special supervision . . . ." (Id.)  Asked to complete a Mental Residual Functional Capacity Assessment form based on an assumption Plaintiff stopped smoking marijuana, Mr. Davis rated Plaintiff as markedly limited in four of the eight abilities listed for sustained concentration and persistence, four of the five abilities listed for social interaction, and two of the four abilities listed for adaptation.  (Id. at 432-33.)  Mr. Davis was, based on the available evidence, unable to rate Plaintiff's mental residual functional capacity for the other abilities and for all three abilities listed for understanding and memory.  (Id.)  Mr. Davis opined that Plaintiff had, regardless of his marijuana use, "additional problems due to symptoms that are indicative of

Schizophrenia, such as the reports of auditory hallucinations, delusions of 'being god,' and verbal explosiveness."  (Id. at 434.)

**The ALJ's Decision**

The ALJ first found that Plaintiff met the insured status requirements of the Act through June 30, 2009, and has not engaged in substantial gainful activity since his amended alleged onset date of August 26, 2008.  (Id. at 12.)  The ALJ next found that Plaintiff has severe impairments of psychosis and GAD.  (Id.)  Plaintiff does not, however, have an impairment or combination of impairments that met or medically equaled one of listing-level severity.  (Id.)  Specifically addressing Listings 12.03 (schizophrenia, paranoia, and other disorders) and 12.04 (affective disorders), the ALJ determined that Plaintiff does not satisfy the "B" criteria for either Listing.  (Id. at 13.)  Specifically, he has mild restrictions of activities of daily living; moderate difficulties in social functioning; and moderate difficulties in concentration, persistence, or pace.  (Id.)  He has had no episodes of decompensation. (Id.)  Also, Plaintiff does not satisfy the "C" criteria for either Listing.  (Id.)

The ALJ then determined that Plaintiff has the RFC to perform a full range of work at all exertional levels.  (Id. at 14.)  He should avoid concentrated exposure to unprotected heights and hazardous machinery.  (Id.)  He can perform simple tasks requiring no more than occasional contact with the public and co-workers.  (Id.)

When assessing Plaintiff's RFC, the ALJ evaluated his credibility and found him not to be entirely credible as to the severity and effects of his symptoms.  (Id. at 14-15.)  He noted that Plaintiff had been "treated for multiple psychiatric conditions for a long period of

time" and had subsequently been diagnosed with psychosis and general anxiety disorder.  (Id. at 14.)  The ALJ found Dr. Peaco's GAF of 45 to be inconsistent with his findings and conclusions.  (Id. at 15.)  The ALJ noted that Plaintiff's medical records are predominantly "for the purpose of medication monitoring and modification."  (Id.)  The records describe him generally as doing well.  (Id.)  His reports of hearing voices telling him to harm himself and of randomly shooting guns are inconsistent with the lack of any medical treatment for injuries caused by him hurting himself.  (Id.)  His reports of paranoia and random outbursts are inconsistent with the lack of legal problems and with his ability to get along with his sister, her husband, and their three children.  (Id.)  Additionally, Plaintiff has a poor work history and "routinely made false and/or misleading statements to his treating sources and at the hearing about his abuse of marijuana."  (Id.)

Addressing the statements of Mr. Davis, the ALJ found them both to be based on Plaintiff's subjective statements and not on any objective tests.  (Id. at 16.)  The two opinions of Dr. DeVore were given weight only to the extent that they were consistent with the record.  (Id.)

With his RFC, Plaintiff can return to his past relevant work as a driveway sealer.  (Id.)  With his age, education, work experience, and residual functional capacity, he can also perform the jobs outlined by the vocational expert.  (Id. at 17.)

The ALJ concluded that Plaintiff is not disabled within the meaning of the Act.  (Id. at 17.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting <u>Cuthrell v. Astrue</u>, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment"

is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v.

Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner

may meet her burden by eliciting testimony by a vocational expert ("VE"), **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues the ALJ fatally failed to properly consider (1) the opinion evidence of Drs. Peaco and DeVore and of Mr. Davis, (2) his residual functional capacity (RFC), and (3) his substance abuse. The Commissioner disagrees.

Opinion Evidence. Plaintiff first challenges the ALJ's consideration of Dr. Peaco's opinion. Dr. Peaco evaluated Plaintiff shortly after Plaintiff's three visits to the St. Joseph Health Center in Wentzville in attempts to get his medications adjusted. Indeed, the week following the evaluation, Plaintiff returned to the hospital and specifically identified that motivation as the reason for his visit. In his evaluation, Dr. Peaco rated Plaintiff's GAF as 45, indicative of serious impairments in social or occupational functioning.[10] The ALJ found this assessment to be inconsistent with Dr. Peaco's findings and other conclusions. Those findings include Plaintiff having mildly impaired persistence and adequate concentration and pace; an intact orientation; a normal appearance; and no serious memory problems. Although other findings, e.g., an "extremely circumstantial" flow of thought and "well below average" vocabulary skills and intellectual functioning, might arguably support a GAF of 45, it was for the ALJ to evaluate Dr. Peaco's opinion in the context of the record as a whole. See **Heino v. Astrue**, 578 F.3d 873, 879 (8th Cir. 2009). That context includes the evaluation being performed before Plaintiff began treatment with a psychiatrist. The record also includes school reports indicating Plaintiff was in the low average range of intellectual functioning and does not include any indication he was ever terminated from a job because of such

---

[10]See note 3, supra.

functioning.  Additionally, "an ALJ may afford greater weight to medical evidence and testimony than to GAF scores when the evidence requires it."  **Jones**, 619 F.3d at 974 (internal quotations omitted).

Dr. Peaco opined that Plaintiff's "social functioning was impaired due to a recent manic episode with psychotic episode."  (R. at 277.)  This opinion was clearly based on Plaintiff's report of such.  Plaintiff also reported, however, that he did not use illegal drugs (he did) and had worked for seven years sealing asphalt (he did not).  He reported he had no social life, but he lived with five family members, played with his nieces and nephews, and had close friends.  There is nothing in the record to suggest that Plaintiff's avoidance of more social activities was not by choice or that he could not "act in a socially acceptable manner when motivated."  **Jones**, 619 F.3d at 972.  There is no error in the ALJ not giving greater weight to those portions of Dr. Peaco's evaluation that were based on Plaintiff's statements.[11] See **Craig v. Apfel**, 212 F.3d 433, 436 (8th Cir. 2000) (rejecting claimant's argument ALJ had improperly ignored portions of treating physician's opinion when the portions were based on claimant's subjective descriptions).

Plaintiff argues that the ALJ's analyzation of Dr. DeVore's evaluation is fatally flawed because he (a) referred to Dr. DeVore having two opinions, but there is one opinion reflected on two forms; (b) did not cite any examples of inconsistent or consistent statements; and (c) failed to consider that Dr. DeVore's evaluation could not be based on substantial evidence because it predates Plaintiff's treatment notes.  Dr. DeVore's evaluation was properly

---

[11]The Court notes that Plaintiff does not challenge the ALJ's adverse credibility determination.

considered by the ALJ "along with the evidence as a whole." **Casey v. Astrue**, 503 F.3d 687, 694 (8th Cir. 2007).  The ALJ's consideration of all the evidence is reflected in his conclusion that Plaintiff had moderate difficulties in concentration, persistence, or pace, whereas Dr. DeVore opined he had only mild difficulties in that area.  Nor did the ALJ err by not citing specific inconsistencies or consistencies between Dr. DeVore's assessments and the record. See **Renstrom v. Astrue**, 680 F.3d 1057, 1065 (8th Cir. 2012) ("[W]hile the ALJ was required to develop the record fully, []he was not required to provide an in-depth analysis on piece of evidence."); accord **Wildman v. Astrue**, 596 F.3d 959, 966 (8th Cir. 2010).  And, regardless whether Dr. DeVore's assessment of Plaintiff's mental limitations on the Psychiatric Review Technique form and on the Mental Residual Functional Capacity Assessment form is considered two opinions or one assessment expressed on two forms, there is nothing to suggest that the ALJ's characterization of the assessment as being the former prejudiced Plaintiff in any way.  See **Johnson v. Apfel**, 240 F.3d 1145, 1149 (8th Cir. 2001) (arguable deficiency in ALJ's opinion-writing technique does not require setting aside finding supported by substantial evidence).

Plaintiff next argues that the ALJ erred by not giving greater weight to Mr. Davis' assessment of his mental abilities.  He contends that Mr. Davis' observations that he "appeared to be confused at times and required questions explained periodically that increased in frequency toward the end of the session" and that he "appeared to have difficulty with noting time frames of his past history" are objective signs of his mental illnesses.  A reading of Mr. Davis' March 2010 report clearly reflects the extent to which he relied on Plaintiff's

complaints when assessing Plaintiff's limitations.  Indeed, Mr. Davis listed symptoms Plaintiff reported and then based his diagnosis on that report.

Nor did the ALJ, as Plaintiff contends, play doctor when discounting Mr. Davis' opinion that Plaintiff's marijuana use was not material.  After quoting portions of the ALJ's decision, see Plaintiff's Brief at 12, Plaintiff states that the ALJ improperly rendered an opinion on the use and effects of marijuana and ignored that of Mr. Davis, who had fourteen years of experience working with people with drug abuse issues.  A reading of the entire, relevant paragraphs makes it clear that the ALJ did not render the alleged opinion.  Instead, the ALJ properly noted Plaintiff's failure to be forthright about his marijuana use, including to Mr. Davis.  Mr. Davis' later opinion about the Plaintiff's marijuana use not being material does not take into account the extent to which that failure to be forthright colored Mr. Davis' evaluation.  See **Teague v. Astrue**, 638 F.3d 611, 616 (8th Cir. 2011) (holding that a physician's medical source statement may be discounted when, inter alia, it is based on claimant's subjective complaints).  See also **Vester v. Barnhart**, 416 F.3d 886, 890 (8th Cir. 2005) (affirming decision of ALJ declining to credit letter from licensed professional counselor about effect of claimant's substance abuse on her functioning; counselor was not acceptable medical source, she had seen claimant only sporadically, and her letter was not supported by the treatment notes).

Plaintiff's RFC.  Plaintiff takes issue with an apparent conflict between the VE's finding that an individual with a GAF of 55 is marginally employable and the ALJ's conclusion that a GAF of 55 suggests mild to moderate symptoms.  The ALJ made this

reference in the context of discussing Plaintiff's August 2008 hospitalization. Plaintiff further argues the ALJ improperly ignored lower GAF scores and the observations of symptoms by Dr. Gavareni that are consistent with Plaintiff's own description of his symptoms.

Although in his decision the ALJ characterized a GAF of 55 as indicating mild to moderate symptoms, when questioning the VE, he characterized it as indicating moderate symptoms. This is accurate. See note 4, supra. See also **Halverson v. Astrue**, 600 F.3d 922, 931 (8th Cir. 2010) (A GAF of 55 reflects "moderate symptoms or moderate difficulty in social or occupational functioning."). Thus, there is no conflict.

There are four GAF scores for Plaintiff in the record. One, a GAF of 35, was assessed at the beginning of his August 2008 hospitalization. Plaintiff was then daily smoking marijuana and was not taking his medications as prescribed. On discharge, he had a GAF of 55. Another GAF, a 45, was assessed by Dr. Peaco; a fourth, a GAF of 40, was assessed by Mr. Davis. These two GAFs by consulting health care providers are not substantial evidence. See **Charles v. Barnhart**, 375 F.3d 777, 783 (8th Cir. 2004) (opinion of consulting physician is generally not considered substantial evidence when he has examined claimant only once). The GAF of 35 when Plaintiff was not compliant with his medications is also not substantial evidence.

Plaintiff argues that the ALJ ignored the objective observations by Dr. Gavareni of symptoms of his mental illnesses. What Plaintiff characterizes as observations, however, are notes of his reports of symptoms. For instance, he states that she observed visual and auditory hallucinations. (See Pl.'s Brief at 4.) On the two office visit notes at issue, Dr.

Gavareni wrote a positive sign by the initials for auditory and visual hallucinations. She did not observe either. Indeed, at both visits she assessed his insight and judgment to be fair. The records of three later office visits specifically refer to Plaintiff describing his auditory hallucinations. Plaintiff's argument is unavailing.

Substance Abuse. In his final argument, Plaintiff contends that the ALJ improperly used his substance abuse when evaluating his credibility. Plaintiff correctly notes that the question of his drug abuse must be addressed if his "symptoms, regardless of cause, constitute disability." **Kluesner v. Astrue**, 607 F.3d 533, 537 (8th Cir. 2010). If so and if there is evidence of drug abuse, then it must be determined "whether those disabilities would exist in the absence of the substance abuse." **Id.** Accord **Brueggermann v. Barnhart**, 348 F.3d 689, 693 (8th Cir. 2003).

In the instant case, however, ALJ did not improperly consider Plaintiff's drug use as a factor in whether he was disabled. Rather, he considered Plaintiff's drug use in the context of evaluating his credibility. A claimant's credibility may be discounted if there are inconsistencies in the record as a whole. See **Halverson**, 600 F.3d at 932. When hospitalized in August 2008, he reported smoking marijuana every day. When evaluated the next month, he reported he did not use drugs. When evaluated in March 2010, he informed Mr. Davis he did not have a history of drug use. At the April 2010 hearing, Plaintiff first testified he was not still smoking marijuana. It had "been a while" since he had stopped. (R. at 37.) He then testified it had been less than twenty-four hours. Asked how often, he first testified he smoked marijuana every other day, then testified he smoked every day.

"'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Juszczyk v. Astrue**, 542 F.3d 626, 632 (8th Cir. 2008) (quoting Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2008)).  Clearly, Plaintiff's inconsistent reports of his drug use is a good reason for discrediting Plaintiff's subjective complaints.[12]

## Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'" **Buckner v. Astrue**, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)).  Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.  An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  27th  day of February, 2014.

---

[12]And, the Court notes it is not the only reason given by the ALJ.